Cathy A. THAYER and Mark Thayer,
Appellants–Plaintiffs,

v.

Charles R. VAUGHAN and Vaughan
and Vaughan, Appellees–
Defendants.

No. 79A02–0303–CV–260.

Court of Appeals of Indiana.

Nov. 6, 2003.

Andrew C. Charnstrom, Ann S. Grayson, Wooden & McLaughlin LLP, Indianapolis, IN, Attorneys for Appellants.

Robert M. Baker, III, Hoover, Hull, Baker & Heath, LLP, Indianapolis, IN, Attorney for Appellees.

## OPINION

BAKER, Judge.

Appellants-plaintiffs Cathy and Mark Thayer ("Cathy," "Mark" or "Thayers") appeal the trial court's ruling regarding her legal malpractice claim against appellees-defendants Charles Vaughan and the law firm of Vaughan and Vaughan ("Vaughan"). Specifically, the Thayers raise three issues, which we consolidate and restate as: (1) whether the trial court erred in denying the Thayers's motion to strike the affidavit of Dr. Larry Davis; and (2) whether the trial court erred in granting summary judgment to Vaughan. Additionally, Vaughan has requested an

award of appellate attorney fees. Finding that the trial court did not abuse its discretion in denying Thayer's motion to strike, correctly granted summary judgment to Vaughan, and that Vaughan is not entitled to appellate attorney fees, we affirm.

*FACTS*

Cathy was employed at the Lafayette Clinic, Inc. ("LCI"), a mental healthcare practice, from September 1988 until September 25, 1997. She originally worked as a receptionist but was promoted to officer manager in 1995 or 1996. Dr. Nizar El–Khalili and Dr. Michael OrRico were the co-owners, officers, and directors of LCI. In 1990, Thayer began to suffer from depression after several deaths occurred in her family, and she began to take antidepressant medication prescribed for her by Dr. El–Khalili. Sometime in 1990 or 1991, Cathy began seeking advice concerning problems she was having with her children and her marriage from Dr. OrRico.

At the end of the office Christmas party in December 1996, Dr. OrRico gave Cathy a stuffed animal as a gift, then kissed her. She shoved him away and said no. Then, early in January 1997, Cathy met Dr. OrRico at the office after hours to discuss business matters. He suggested they drive around in his truck to talk, and she agreed. Dr. OrRico drove out to the country, turned off the truck, locked the doors and scooted over to her side of the truck. The two then had sexual intercourse in spite of Cathy telling him no. Then at the end of January, Cathy agreed to meet Dr. OrRico at the Holiday Inn in Crawfordsville. When Cathy entered the room, Dr. OrRico was naked, and the two again engaged in sexual intercourse. Afterward, they had dinner in the hotel room and talked for several hours. From that point until October 1997, Cathy and Dr. OrRico

had a consensual sexual affair. During the affair, Cathy stated that she wanted to spend the rest of her life with Dr. OrRico, and that he was the nicest, sweetest thing that had ever happened to her. However, she became unhappy when he decided to stay with his wife.

At some point, Dr. El–Khalili discovered the affair between Cathy and Dr. OrRico and told Dr. OrRico that either he or Cathy had to leave LCI. Dr. El–Khalili felt that the personal relationship between his partner and employee interfered with the functioning of the office, especially since Cathy, who worked for the corporation, was doing things for Dr. OrRico's personal practice that were beyond her duties. Dr. El–Khalili felt uncomfortable continuing to work together with both Dr. OrRico and Cathy. Dr. OrRico talked to Cathy about the situation and asked her to leave the clinic. She prepared a letter of resignation and left LCI on September 25, 1997.

The Thayers decided to take legal action and initially talked to lawyer Doug Pool about a potential cause of action in February 1998. When Pool told them he would not take the case, the Thayers went to Vaughan and Vaughan and spoke with Robert Johnson on February 26, 1998. At that first meeting, the Thayers discussed at some length the facts surrounding their possible claims against LCI. Johnson agreed to review the information, to consider their potential claims, and thereafter to meet with the Thayers again with Charles Vaughan, his supervisor. That meeting took place on April 28, 1998. Vaughan testified that he informed the Thayers at that meeting that the firm was not going to take the sexual harassment case because it had no merit, but the Thayers deny this. Appellant's App. Tab 23 p. 3.

The Thayers retained other legal counsel and ultimately filed a suit that included

a medical malpractice claim against Drs. El–Khalili and OrRico in the Tippecanoe Superior Court. The claim against Dr. El–Khalili was settled without a payment of money, and the suit was dismissed against him. The claim for medical malpractice against Dr. OrRico was dismissed by summary judgment, but this court reversed in *Thayer v. OrRico*, 792 N.E.2d 919 (Ind.Ct.App.2003), finding a genuine issue of material fact as to whether there was a doctor-patient relationship between Cathy and Dr. OrRico.

The Thayers filed a complaint for legal malpractice against Vaughan on March 23, 2000, alleging that Vaughan failed to take necessary steps to preserve and prosecute their potential claims for sex discrimination and sexual harassment. Vaughan responded with an answer and a counterclaim for defamation and abuse of process against the Thayers and a third-party complaint for defamation and abuse of process against their attorney. Vaughan filed a motion for summary judgment on November 7, 2002, and the Thayers filed a cross motion for summary judgment. In Vaughan's brief opposing the Thayer's cross motion and supporting Vaughan's motion, Vaughan tendered the affidavit of Dr. Larry Davis, which set forth his credentials and explained that he reviewed "voluminous materials relevant to Cathy Thayer and her suit" to reach his opinions. Appellant's App. tab 8 p. 4–5. Dr. Davis indicated in his affidavit that he received his M.D. degree from the Indiana School of Medicine in 1967, that he is licensed to practice in Indiana, Illinois, and Kentucky, and that he specializes in psychiatry. Dr. Davis opined that Cathy did not have a doctor-patient relationship with Dr. OrRico, that Cathy and Dr. OrRico perceived their feelings to be reciprocal love, that Cathy was of sound mind during her relationship with Dr. OrRico, and that Cathy did not show signs of dissociation during

her four depositions. The Thayers filed a motion to strike Dr. Davis's affidavit, which the trial court later denied. Following a hearing on February 19, 2003, the trial court granted Vaughan's motion for summary judgment. The Thayers now appeal.

## DISCUSSION AND DECISION

### I. Motion to Strike

Cathy contends that the trial court erred in denying her motion to strike the affidavit of Dr. Larry Davis that Vaughan submitted in support of his motion for summary judgment. Specifically, she argues that the testimony was unreliable, and therefore should not have been admitted into evidence.

■■■ The standard of review for admissibility of evidence issues is abuse of discretion. *Fairfield Development, Inc. v. Georgetown Woods Sr. Apartments Ltd. Partnership*, 768 N.E.2d 463, 466–67 (Ind. Ct.App.2002). "An abuse of discretion occurs only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court." *Id.* Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice. *Id.*

■■■ Indiana Rule of Evidence 702 provides for the admissibility of expert opinions. The rule states:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Ind. Evidence Rule 702. In addition to asserting admissible facts upon which the opinion is based, an expert opinion affidavit must also state the reasoning or methodologies upon which it is based. *Doe v. Shults–Lewis Child and Family Servs.*, 718 N.E.2d 738, 750 (Ind.1999). The trial court must be provided with enough information to proceed with a reasonable amount of confidence that the principles used to form the opinion are reliable. *Id.* at 750–51. A list of admissible facts and a bald conclusion drawn therefrom is insufficient. *Id.* at 750. In *Time Warner Entertainment Co. v. Whiteman*, 741 N.E.2d 1265, 1274 (Ind.Ct.App.2001), we upheld the admission of an expert opinion affidavit where the affiant connected her experience, the data, and her conclusions. Thus, we look for the same characteristics in Dr. Davis's affidavit.

■ Dr. Davis testified that he received his M.D. degree from the Indiana School of Medicine in 1967 and is licensed to practice in Indiana, Illinois, and Kentucky. He further stated that he specializes in psychiatry and is a Diplomate in the American Board of Psychiatry and Neurology, the Board of Clinical Sexology, the Board of Forensic Examiners, and the American Board of Forensic Medicine. Dr. Davis provided that in the course of his forensic psychiatric practice he had reviewed "voluminous materials" relevant to Cathy and her suit. He went on to detail that he had reviewed depositions, including those of Cathy, Dr. OrRico, Dr. El–Khalili and Dr. Toner Overly. His experience and his review of this data led him to conclude that Cathy did not have a doctor-patient relationship with Dr. OrRico, that Cathy and Dr. OrRico perceived

their feelings to be reciprocal love, that Cathy was of sound mind during her relationship with Dr. OrRico, and that Cathy did not show signs of dissociation during her four depositions.

As a psychiatrist, Dr. Davis is uniquely trained to make the observations he described in his conclusions. For example, Dr. Davis expressly detailed how the answers given by Cathy in her deposition were at odds with a diagnosis of dissociation. The information provided in the affidavit was sufficient to establish that these were more than bald conclusions. Therefore, Dr. Davis's opinion was reliable, and the trial court did not err when it considered it with the summary judgment motions.

## II. Summary Judgment

Thayer next argues that the trial court erred in granting Vaughan's motion for summary judgment and contends that her motion should have been granted. Specifically, Thayer argues that the designated evidence establishes that Vaughan committed legal malpractice as a matter of law by not filing her sex discrimination and sexual harassment claims because there was sufficient evidence to support her claims and because they were not time barred.

Initially, we note that when reviewing the grant or denial of a summary judgment motion, we apply the same legal standard as the trial court. *Mattingly v. Warrick County Drainage Bd.*, 743 N.E.2d 1245, 1247 (Ind.Ct.App.2001). As we stated in *Little Beverage Co., Inc. v. DePrez*, 777 N.E.2d 74, 77–78 (Ind.Ct.App.2002):

[S]ummary judgment is appropriate when no designated genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Our standard of review is not altered by cross motions for summary judgment on the same issues. A party

appealing the denial of summary judgment carries the burden of persuading this court that the trial court's decision was erroneous. The movant must demonstrate the absence of any genuine issue of fact as to a determinative issue and only then is the non-movant required to come forward with contrary evidence. This court may not search the entire record but may only consider the evidence that has been specifically designated. All pleadings, affidavits, and testimony are construed liberally and in a light most favorable to the nonmoving party.

(citations omitted).

■ To prove a legal malpractice claim, the Thayers must establish four elements: (1) employment of the attorney, which creates a duty; (2) failure of the attorney to exercise ordinary skill and knowledge (breach); (3) that such negligence was the proximate cause (4) of damage to the client. *Rice v. Strunk,* 670 N.E.2d 1280, 1283–84 (Ind.1996). Proximate cause requires at a minimum that the outcome of the underlying litigation would have been more favorable but for the defendant attorney's negligence. *Sleweon v. Burke, Murphy, Constanza & Cuppy,* 712 N.E.2d 517, 520 (Ind.Ct.App.1999). This proof generally requires a "trial within a trial." *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 344 (Ind.1991).

■ Here, the "trial within a trial" was the claim of sex discrimination and the claim of sexual harassment. The Thayers contend that these claims should have been brought under Title VII. Civil Rights Act of 1964 et seq., as amended, 42 U.S.C. § 2000e et seq. Under Title VII, a charge of discrimination or harassment must first be filed with the Equal Employment Op-

portunity Commission ("EEOC") within 300 days [1] after the alleged unlawful employment practice occurred to preserve the claim for filing suit. § 2000e–5(e). Failing to meet this deadline bars any subsequent claim. *Speer v. Rand McNally & Co.,* 123 F.3d 658, 662 (7th Cir.1997). The limitation period begins to run when the unlawful practice occurs, not when the plaintiff feels the effect of the practice. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

### A. Sex Discrimination Claim

■ Cathy alleges that she had a viable claim of sex discrimination based on her forced resignation when she first met with Vaughan. In order to establish a prima facie case of sex discrimination under Title VII, the Thayers had to show that (1) Cathy was a member of a protected class (i.e., female); (2) she was qualified for the job in question or was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action (i.e., asked to resign); and (4) the employer treated similarly situated persons not in the protected class more favorably. *Bragg v. Navistar Int'l Transp. Corp.,* 164 F.3d 373, 376 (7th Cir. 1998); *Elliott v. Sterling Mgmt., Ltd., Inc.,* 744 N.E.2d 560, 563 (Ind.Ct.App.2001). If the plaintiff does not establish any one of the four elements, her Title VII claim fails as a matter of law. *Elliott,* 744 N.E.2d at 563. If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Krchnavy v. Limagrain Genetics Corp.,* 294 F.3d 871, 875 (7th Cir.2002). If such a reason is proffered, the plaintiff then bears the ultimate burden of showing that it is a pretext for discrimination. *Id.*

**1.** Indiana is a "deferral" state, which means that the time within which to file is 300 days rather than 180 days as specified in § 2000e–5(e)(1).

In examining the four elements of a sex discrimination claim, we note that the evaluation of an employee's job performance is not necessarily confined to an appraisal of her substantive work, but may include other considerations relevant to the maintenance of the work force. *Elliott,* 744 N.E.2d at 565. In support of her contention that she was meeting her employer's legitimate expectations, Cathy notes that she was promoted during her time at LCI, that LCI was sending her to business school to advance her abilities, and that neither Dr. El–Khalili nor Dr. OrRico ever expressed dissatisfaction with her work performance. However, appellate courts reviewing Title VII claims do not sit as a "super-personnel department that re-examines an entity's business decisions." *Id.* Dr. El–Khalili felt that the personal relationship between his partner and employee interfered with the functioning of the office, especially since Cathy, who worked for the corporation, was doing things for Dr. OrRico's personal practice that were beyond her duties. Although Dr. El–Khalili expressed his belief that Cathy was a great, devoted employee, he felt uncomfortable continuing to work together in light of the personal relationship she had with Dr. OrRico. We decline to re-examine his business decision in this respect. Thus, Cathy has failed to show that she met her employer's legitimate job expectations.

Cathy's argument also may not succeed on yet another basis. As to the final element, we note that "to show that another employee is 'similarly situated,' a plaintiff must prove that all of the relevant aspects of her employment situation are 'nearly identical' to those of the other employee she alleges was treated more favorably, and that the conduct of the other employee was 'equally bad.'" *Id.* at 564. A court must look at all the relevant factors, including whether the employees dealt with the same supervisor and whether the employees had comparable experience, education and qualifications. *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 618 (7th Cir.2000).

Cathy alleges that she and Dr. OrRico, who did not resign, are similarly situated because they committed the same indiscretion, were both LCI employees, were both supervisors, and were both valuable to LCI's business. We disagree that this shows that Cathy and Dr. OrRico were similarly situated with respect to a potential claim under Title VII. Specifically, the record establishes that Dr. OrRico was a co-owner, director and officer of LCI, while Cathy was merely an employee. Dr. OrRico and Dr. El–Khalili shared the highest supervisory authority, while Cathy was subordinate to them. Dr. OrRico was an educated, professional employee, while Cathy was a staff employee. And most importantly, as a 50% stockholder, if Dr. OrRico had left LCI, there would have been a substantial financial and organizational impact on LCI. None of these repercussions occurred when Cathy resigned. Under these circumstances, we cannot say that the employment situations of Cathy and of Dr. OrRico were "nearly identical" for a claim to proceed under Title VII.

Inasmuch as Cathy's claim of sex discrimination is based on her requested resignation, the action was not time barred when she first came to Vaughan. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (finding that discrete discriminatory acts, including termination, require that a charge of discrimination be filed within 300 days of their occurrence). She resigned on September 25, 1997, and the 300–day period in which she could bring a claim to the EEOC expired on July 22, 1998. Cathy came to Vaughan's office on February 26, 1998, 147 days before her claim ex-

pired. However, because Cathy has failed to establish two of the four required elements of sex discrimination, she has similarly failed to prove that the outcome of the underlying litigation would have been more favorable but for any alleged negligence on the part of her legal counsel. Inasmuch as Cathy cannot prove that Vaughan proximately caused her damage, there was no genuine issue of material fact. Therefore, the trial court properly granted Vaughan summary judgment on this issue.

### B. Sexual Harassment

Cathy bases her sexual harassment claim upon the creation of a hostile work environment. She alleges that this hostile work environment was created because she was "subjected to unwelcome sexual advances" and because she was involved in "a sexual 'relationship' that continued through Cathy's forced resignation." Appellant's br. p. 26.

 Title VII sexual harassment claims fall within two categories: quid pro quo harassment and hostile work environment harassment. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 750, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Quid pro quo harassment occurs when tangible employment benefits are conditioned upon an employee's compliance with the harasser's sexual demands. *Brill v. Lante Corp.,* 119 F.3d 1266, 1274 (7th Cir.1997). In a hostile work environment claim, sexually demeaning behavior must be so severe or pervasive as to alter the terms and conditions of employment. *Ellerth,* 524 U.S. at 750, 118 S.Ct. 2257. The elements for a hostile environment claim are: (1) unwelcome harassment in the form of sexual advances, requests for sexual favors, or other conduct of a sexual nature; (2) harassment based on the sex of the victim; (3) creation, through harassment, of an intimidating, hostile or offensive working environment that unreasonably interfered with work performance; and (4) a basis for employer liability for the conduct of the actor. *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354–55 (7th Cir.2002). To prevail, the Thayers had to offer some evidence that Thayer's work environment was both subjectively and objectively hostile. *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1143 (7th Cir.1997). "[T]he fact that sex-related conduct was voluntary in the sense that the complainant was not forced to participate against her will is not a defense to a sexual harassment suit brought under Title VII." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). However, the gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome. *Id.*

 Thayer relies chiefly upon *Vinson* in support of her argument that she made a prima facie case of hostile environment sexual harassment. In *Vinson,* the plaintiff worked as a bank teller, supervised by Taylor. During her employment, the plaintiff contended that Taylor invited her to dinner, then suggested they go to a motel for sex. She initially declined, then consented. Taylor made repeated demands for sex, during and after work hours, and they had intercourse 40 or 50 times. Taylor followed the plaintiff into the restroom, fondled her in front of other employees, exposed himself to her, and on occasions forcibly raped her. The plaintiff never reported the harassment to Taylor's supervisors because of her fear of Taylor's authority over her job. *Vinson,* 477 U.S. at 59–61, 106 S.Ct. 2399. The *Vinson* court held that these facts stated a viable case of sexual harassment under the theory of hostile work environment. *Id.*

However, unlike the circumstances in *Vinson,* the events that transpired between Cathy and Dr. OrRico occurred al-

most entirely away from the workplace. Although her co-workers apparently knew something was "going on" between Cathy and Dr. OrRico, Appellant's App. tab 5 p. 243, there is no evidence of any tension among Cathy and the other employees except for one person who made some snide remarks. Appellant's App. tab 5 p. 243. Further, Cathy testified that she "loved her job." Appellant's App. tab 5 p. 242. Thus, the evidence fails show that Cathy found her work environment to be subjectively hostile.

Additionally, Cathy fails to establish that Dr. OrRico's advances were unwelcome. Cathy testified that she loved Dr. OrRico, that she wanted to spend the rest of her life with him, that he was the nicest, sweetest thing that had ever happened to her, and that she was unhappy when he decided to stay with his wife. Appellant's App. tab 5 p. 302, 312, 313, 329. Even assuming that the first kiss and the first two instances of sexual intercourse were unwelcome, these events happened nearly 400 days before Cathy first walked into Vaughan's office. Thus, these instances would have been time barred.

Nonetheless, Thayer argues that the sexual harassment constituted a continuing violation that lasted until Cathy left her employment on September 25, 1997. In support of her argument, Thayer relies chiefly on *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The *Morgan* Court said:

A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Morgan,* 536 U.S. at 116, 122 S.Ct. 2061. The Court went on to explain that it is the trial court's task to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period. *Id.* at 120, 122 S.Ct. 2061. Thus, the continuing violation theory cannot save a claim when there is not an "anchor" allegation of sexual harassment within the applicable limitation period. *Speer v. Rand McNally,* 123 F.3d 658, 663 (7th Cir.1997). In *Speer,* the Seventh Circuit noted that the purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred. *Speer,* 123 F.3d at 663.

In this case, the consensual affair cannot serve as an "anchor event" inasmuch as a consensual affair is not sexual harassment under Title VII as discussed above. Additionally, Cathy's resignation may not serve as an "anchor event" because that act does not involve the same type of conduct as the initial events between Cathy and Dr. OrRico. Cathy was not asked to resign because she was kissed by or had sexual intercourse with Dr. OrRico. She was asked to resign because her relationship with Dr. OrRico interfered with the functioning of the office and because LCI could more readily afford to lose her as an employee than Dr. OrRico. Finally, to allow Cathy to use any of these

as "anchor events" would contravene the purpose of the continuing violation theory as enunciated by the *Speer* court. It is undisputed that the sexual nature of Dr. OrRico's acts was apparent at the time they occurred. Thus, Cathy fails to establish that the 300–day limitation should be tolled in her case. We find that because Thayer has failed to establish a prima facie case of sexual harassment and has failed to show that her claim was not time barred, the trial court properly granted Vaughan's motion for summary judgment.

### III. Appellate Attorney Fees

Finally, we address an argument that Vaughan presents on cross-appeal. Specifically, Vaughan asserts that they are entitled to appellate attorney fees pursuant to Indiana Appellate Rule 66(E), which states in pertinent part, "The Court may assess damages if an appeal ... is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees."

Our discretion to award attorney fees under Indiana Appellate Rule 66(E) is limited to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Orr v. Turco Mfg. Co., Inc.*, 512 N.E.2d 151, 152 (Ind.1987). However, we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal. *Tioga Pines Living Ctr., Inc. v. Indiana Family and Social Servs. Admin.*, 760 N.E.2d 1080, 1087 (Ind. Ct.App.2001) *trans. denied.*

Vaughan argues that this case warrants attorney fees because Thayer has proceeded in "substantive" bad faith. To prevail on a substantive bad faith claim, Vaughan must show that Thayer's contentions and arguments are utterly devoid of all plausibility. *Boczar v. Meridi-*

*an Street Found.*, 749 N.E.2d 87, 95 (Ind. Ct.App.2001). Vaughan testified that they did, in fact, prepare a complaint under the common law for assault and battery, intentional infliction of emotional distress, interference with advantageous business relationship and negligent infliction of emotional distress, but that the Thayers never authorized the filing of the complaint. Appellee's br. p. 17; Appellee's App. tab 35 p. 4–10. Additionally, Vaughan and Johnson testified that they told the Thayers early on that they would not handle the sexual harassment claim. Appellee's App. tab 37 p. 1; tab 14 p. 4. However, the Thayers deny both of these claims, and, as the non-movants, we must view the evidence in the light most favorable to the Thayers. Therefore, Vaughan can make no more than bald assertions that Thayer's "case has continued to be pursued upon the most tenuous grounds...." Appellee's br. p. 40. This falls far short of establishing that Thayer's claims are utterly devoid of all plausibility. Therefore, we deny Vaughan's request for appellate fees.

### CONCLUSION

In light of the disposition of the above issues, we find that Dr. Davis's affidavit opinion contained sufficient indicia of reliability and therefore was properly considered by the trial court with the summary judgment motions. We also find that the trial court properly granted summary judgment to Vaughan while denying summary judgment to Thayer. Finally, we deny Vaughan's request for an award of appellate attorney's fees.

Affirmed.

BROOK, C.J., and SHARPNACK, J., concur.